FILED
CLERK
1:57 pm, Jul 23, 2021
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

IN RE FDCPA MAILING VENDOR
CASES.

**MEMORANDUM &
ORDER**

Civil Action Nos. 21-2312,
21-2587, 21-3002, 21-3383,
21-3434 & 21-3462

----------------------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

  This memorandum addresses pending cases predicated upon purported violations of the Fair Debt Collection Practices Act ("FDCPA") emanating from the provision of data by debt collectors to mailing vendors.  No actual damages are alleged by plaintiffs in any of these cases, all of which have been filed as class actions.  Recent developments in the law, including the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), suggest that the plaintiffs in these cases lack standing and the Court therefore has no jurisdiction over these matters. In each of the cases referenced herein, the Court issued a show cause order directing that each plaintiff demonstrate standing and providing the plaintiff an opportunity to providing factual material and authority.  In each case, the plaintiff has failed to demonstrate a concrete injury that would provide a basis for standing.  As such, for the reasons discussed and to the extent described herein, these cases are dismissed.

*The FDCPA and its Use and Abuse in this Judicial District*

  The FDCPA was enacted in response to a "serious national problem" of debt collection abuse. S. Rep. 95–382, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696.  Congress enacted

the statute "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Greco v. Trauner, Cohen & Thomas, L.L.P.*, 412 F.3d 360, 363 (2d Cir. 2005) (quoting 15 U.S.C. § 1692(e)); *see also Benzemann v. Citibank, N.A.*, 806 F.3d 98, 100 (2d Cir. 2015) (same); *see also Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*, No. 14-CV-7539 (MKB), 2016 WL 1274541, at *3 (E.D.N.Y. Mar. 31, 2016) ("The FDCPA was enacted to protect consumers from abusive debt collection practices by third-party debt collectors, to create parity in the debt collection industry and to standardize governmental intervention in the debt collection market."). In order to achieve these objectives, "the FDCPA creates a private right of action for debtors who have been harmed by abusive debt collection practices." *Benzemann*, 806 F.3d at 100 (citation omitted). As the Second Circuit has explained:

> The legislative history of the passage of the FDCPA explains that the need for the FDCPA arose because of collection abuses such as use of "obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process."

*Kropelnicki v. Siegel*, 290 F.3d 118, 127 (2d Cir. 2002) (quoting S. Rep. No. 95–382, at 2).

The history of the deployment of the statute before this Court includes actions that appear fully consistent with its laudable Congressional purpose. *See, e.g.*, *Hamlett v. Santander Consumer USA Inc.*, 931 F. Supp. 2d 451, 457 (E.D.N.Y. 2013) (involving allegations that "defendants called plaintiffs—including one plaintiff who suffers from mental disabilities and was uninvolved in the underlying loan—9,500 times over 11 months," and "made threats including false threats of arrest").

2

Legions of FDCPA cases that have little to do with the purposes of the statute have appeared on this Court's docket. "As my colleagues in the Eastern District of New York have observed [in confronting] lawyers [who] have attempted to apply [the FDCPA] in ways Congress never imagined or intended, 'remedial laws can themselves be abused and perverted into money-making vehicles for individuals and lawyers.'" *Ostreicher v. Chase Bank USA, N.A.*, No. 19-CV-8175 (CS), 2020 WL 6809059, at *6 (S.D.N.Y. Nov. 19, 2020) (quoting *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 465 (E.D.N.Y. 2012)) (collecting cases). Judge Cogan in *Saunders*, in turn, raised a "serious concern that this lawsuit reflects an attempt by plaintiff and/or his attorney to manipulate the law for an improper purpose," to wit: "whether plaintiff deliberately misled NCO for the purpose of creating a claim against it under the FDCPA and the TCPA that could be settled for nuisance value plus attorneys' fees." *Saunders*, 910 F. Supp. 2d at 471 (ordering Rule 11 hearing).

In another case, Judge Garaufis considered a claim that a letter referring to a plaintiff as a "customer" of the debt collector constituted an actionable violation of the statute. In rejecting this claim, Judge Garaufis observed:

> Both parties assert that no court has considered whether the word "customer" is deceptive under the FDCPA. This dearth of authority likely exists because only attorneys willing to engage in "bizarre or idiosyncratic interpretations" of a collection notice would advance such claims. Plaintiff's attorney's willingness to advance such a far-fetched legal theory is due, in all likelihood, to the provisions in the consumer protection statute at issue affording statutory damages without proof of harm and the availability of class action treatment. Congress enacted the FDCPA in order to combat egregious abuses of debtors, abuses that are real and troubling. It is almost as troubling, however, for an attorney to take unreasonable advantage of Congress's good intentions and the sound legislation it has enacted.

*Turner v. Asset Acceptance, LLC*, 302 F. Supp. 2d 56, 59 (E.D.N.Y. 2004). Or as Judge Cogan observed:

> In this Court, however, and I suspect in many others, the use of the statute has

> evolved into something quite different than its original purpose would suggest. The majority of cases that I see under the statute are brought by a handful of the same lawyers, based on complaints that read much more like legal briefs than complaints. Frequently, these cases are brought on behalf of the same debtor-plaintiffs, who seize on the most technical alleged defects in collection notices or telephone communications, often raising claims of "confusion" or "deception" regarding practices as to which no one, not even the least sophisticated consumer, could reasonably be confused or misled. These cases are often brought for the non-salutary purpose of squeezing a nuisance settlement and a pittance of attorneys' fees out of a collection company, which it will often find cheaper to pay than to litigate. A cottage industry among limited players—plaintiffs' lawyers, debtors, and even defendants' lawyers—appears to be the primary progeny of the statute.

*Huebner v. Midland Credit Mgmt., Inc.*, 85 F. Supp. 3d 672, 673 (E.D.N.Y. 2015).

In still another case, Judge Glasser observed:

> Given the innocuous nature of the Letter, the Court could not help but wonder: How did Kraus find herself in federal court? This question was posed to plaintiff's counsel during oral argument, and his answer is enlightening: "[F]inancial distress." Tr. at 17:3. According to plaintiff's counsel, Kraus sought him out because "she's in debt and she would like some guidance as to what she can do in terms of getting out." *Id.* at 18:2–4. In other words, according to her counsel, Kraus did not seek an attorney because she felt abused, deceived, or otherwise aggrieved; she did so because she wanted help getting out of debt. The FDCPA is not a debt-relief statute, however, and courts should not indulge thinly veiled attempts to use it as one.
>
> Sadly, abuse of the statute is unsurprising given the development of the law in this area, and the Court suspects such abuse is fairly widespread. In 2006, the Court observed that "[t]he interaction of the least sophisticated consumer standard with the presumption that the FDCPA imposes strict liability has led to a proliferation of litigation in this district." *Jacobson v. Healthcare Fin. Servs., Inc.*, 434 F.Supp.2d 133, 138 (E.D.N.Y. 2006), *aff'd in part, vacated in part, rev'd in part*, 516 F.3d 85 (2d Cir. 2008). Since then, the number of FDCPA cases filed yearly in this District has more than quintupled. And small wonder, when all required of a plaintiff is that he plausibly allege a collection notice is "open to more than one reasonable interpretation, at least one of which is inaccurate." *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993). This standard prohibits not only abuse but also imprecise language, and it has turned FDCPA litigation into a glorified game of "gotcha," with a cottage industry of plaintiffs' lawyers filing suits over fantasy harms the statute was never intended to prevent.

*Kraus v. Pro. Bureau of Collections of Maryland, Inc.*, 281 F. Supp. 3d 312, 321–22 (E.D.N.Y.

2017).[1]

*Graff v. United Collection Bureau, Inc.*, 132 F. Supp. 3d 470 (E.D.N.Y. 2016) provides yet another example of the present state of FDCPA litigation. In that case – the second class action brought against the same debt collector for the very same activity – counsel proposed a class action settlement that provided for hundreds of thousands of dollars in attorneys' fees and administrative costs, but nothing – absolutely zero – in damages to be awarded to more than a half million members of the class. *Id.* at 473. This Court rejected the settlement, in which the total payout to those other than legal personnel amounted to a *cy pres* charitable donation equal to seven cents per plaintiff. *Id.*

For cases involving statutory violations without actual damages, the FDCPA provides for a maximum of $1,000 in statutory damages. 15 U.S.C. § 1692k(a)(2)(A); *Savino v. Computer Credit Inc.*, 164 F.3d 81, 86 (2d Cir.1998) ("All that is required for an award of statutory damages is proof that the statute was violated, although a court must then exercise its discretion to determine how much to award, up to the $1,000 ceiling."). Moreover, liability in a class action under the FDCPA may not "exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector." 15 U.S.C. § 1692k(a)(2)(B); *accord Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 126 n.1 (2d Cir. 2016). Perhaps most significantly, a prevailing party under the FDCPA is entitled to "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1692k(a)(3); *accord Jacobson v. Healthcare Fin. Services, Inc.*, 516 F.3d 85, 95 (2d Cir. 2008) ("The FDCPA provides for fee-shifting as a matter of course to successful plaintiffs."

---

[1] In an effort to deal with the resulting crush of cases, judges in this district, and presumably elsewhere, have adopted FDCPA-specific procedures designed to encourage early resolution of these matters. *See, e.g.*, Individual Practice Rule V(a) of District Judge Gary R. Brown (directing all FDCPA cases to court mediation); Individual Rule III. D. of Magistrate Judge Sanket Bulsara (directing that counsel appear with clients with full settlement authority at the Initial Rule 16 conference). Resistance to these efforts by plaintiff's counsel is demonstrated by one of the cases at bar. See Civil Cover Sheet at 2, *Kivo v. State Collection Service, Inc.*, No. 21-CV-3434, ECF No. 1-1 (counsel claiming that case is ineligible for mediation because "Matter filed as a putative class action").

(emphasis removed)). And "therein lies the rub."[2]

Incentivized by the promise of easy settlements and attorneys' fees, counsel representing FDCPA plaintiffs have applied considerable imagination in devising theories of violation. *See, e.g.*, *Bryan v. I.C. Sys., Inc.*, 2017 WL 9485658 (E.D.N.Y. 2017), *adopted by* No. 15-CV-6984, 2017 WL 4326041 (E.D.N.Y. 2017) (rejecting claim that misrepresenting debt collector's Better Business Bureau Rating as an A+ rather than a B constituted deceptive practice); *Mebane v. GC Servs. Ltd. P'ship*, 481 F. Supp. 2d 249, 249–50, 253 (S.D.N.Y. 2007) (finding "patently frivolous" claims by a plaintiff that "defendant's letter constituted a deceptive debt collection practice because it did not specifically list personal checks as an acceptable mode of payment").

Recent legal developments require additional analysis of some of these claims.

*The Transunion Decision*

In June 2021, the Supreme Court issued its ruling in *TransUnion LLC v. Ramirez*, which examined a class action brought under the Fair Credit Reporting Act. In that case, the class of plaintiffs alleged that the defendant "failed to comply with statutory obligations (i) to follow reasonable procedures to ensure the accuracy of credit files so that the files would not include OFAC alerts labeling the plaintiffs as potential terrorists; and (ii) to provide a consumer, upon request, with his or her complete credit file, including a summary of rights." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). The Court examined whether various subclasses of plaintiffs had standing, noting:

> For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law. Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue

---

[2] Shakespeare, *Hamlet*, Act iii. Sc. 1.

> defendants who violate those legal prohibitions or obligations. But under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court . . . Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions.

*Id.* at 2205 (italics original; alterations omitted).

Proceeding to the analysis, the Court reiterated some preliminary principles: "Plaintiffs bear the burden of demonstrating that they have standing . . . must maintain their personal interest in the dispute at all stages of litigation [and] must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 2207–08 (alterations omitted). Furthermore, "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Id.* at 2208.

Applying these concepts to the two groups of plaintiffs in *TransUnion* produced different results. Being falsely labeled as a terrorist, and having that information disseminated to third parties, the Court determined, resulted in "a harm with a 'close relationship' to the harm associated with the tort of defamation." *Id.* at 2209. Where the defendant provided third parties with reports labeling plaintiffs as "potential terrorists, drug traffickers, or serious criminals," such information could quite obviously "subject [plaintiffs] to hatred, contempt, or ridicule." *Id.* Thus, the Court concluded, this group of plaintiffs "suffered a concrete harm that qualifies as an injury in fact." *Id.*

The remaining plaintiffs, however, had similarly false information contained in their credit files maintained by the defendants, but those reports were not disseminated. "The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 2210. Even the risk of future dissemination did not provide constitutional standing. *Id.*

7

Two other claims addressed by the Court in *TransUnion* prove instructive.  First, in the "disclosure" claim, plaintiffs alleged that the defendant, inconsistent with its obligations, "sent the plaintiffs copies of their credit files that omitted the OFAC information, and then in a second mailing sent the OFAC information."  *Id.* at 2213.  The Court recognized that the "plaintiffs presented no evidence that, other than Ramirez, 'a single other class member so much as *opened* the dual mailings,' 'nor that they were confused, distressed, or relied on the information in any way.'"  *Id*.  In the final analysis, the Court determined that "bare procedural violation[s], divorced from any concrete harm . . . does not suffice for Article III standing."  *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016)).

Other district courts have recognized the effect of *TransUnion* on certain FDCPA cases.  In *Kale v. Procollect, Inc.*, No. 2:20-CV-2776, 2021 WL 2784556, at *3–4 (W.D. Tenn. July 2, 2021), the district court dismissed an FDCPA class action, finding that the named plaintiff lacked standing because the complaint only "alleged procedural violations of the FDCPA."  In reaching this determination, the court held that, in *TransUnion*, the Supreme Court recognized that "risk-of-harm analysis applies only in suits seeking injunctive relief and cannot be used to establish standing in a suit for damages."  *Id.*  Similarly, in *Van Hoven v. Buckles & Buckles, P.L.C.*, No. 1:14-CV-60, 2021 WL 2947593, at *4 (W.D. Mich. July 1, 2021), the district court found dismissal under the bona fide error defense "especially fitting" in light of *TransUnion* because "[t]here is no injury to Plaintiff, here, in just having the failed garnishment cost on the defendants' books[.]"  Since "[t]he $15 failed garnishment cost was never collected at all," under *TransUnion*, "plaintiff may not have standing to proceed in any event."  *Id.*

*The Mailing Vendor Cases*

Each case addressed herein invokes a recently-developed "mailing vendor" theory – alleging that the defendant debt collector employed an outside firm to print and mail so-called "dunning" letters to the plaintiffs. Plaintiffs argue that this violates the statute because the FDCPA limits the individuals and entities with which a debt collector may share information. *See* 15 U.S.C. § 1692c(b) ("[A] debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector."). These cases emanate from an 11th Circuit decision decided earlier this year. *See Hunstein v. Preferred Collection and Management Services Inc.*, 994 F.3d 1341, 1347-49 (11th Cir. 2021).

*Hunstein*, though instructive, is not binding upon this Court, as the Second Circuit has not spoken on this theory. Moreover, the Supreme Court's decision in *TransUnion* casts significant doubt on the continued viability of *Hunstein*. And, as demonstrated below, even if valid, *Hunstein* may not apply to the facts of the instant cases.

First, in *TransUnion,* the Supreme Court held that the "mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." 141 S. Ct. at 2210. In reaching this determination, which certainly presents a hurdle to the mailing vendor theory advanced in *Hunstein*, the Court observed:

> . . . the plaintiffs also argue that TransUnion "published" the class members' information internally—for example, to employees within TransUnion and to the vendors that printed and sent the mailings that the class members received. That new argument is . . . unavailing. Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation. Nor have they necessarily recognized disclosures to printing vendors as actionable publications.

9

*Id.* at 2210 n.6 (citations omitted). While *dicta*, this language appears dispositive of the mailing vendor theory.

Second, *TransUnion* emphasizes that "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm." *Id.* at 2210–11; *see also Fifth Ave. Peace Parade Comm. v. Gray*, 480 F.2d 326, 332 (2d Cir. 1973) (rejecting "mere speculative apprehension of future misuse of information" as grounds for standing). Even to consider the risk of future harm, the Supreme Court found that the plaintiffs had to demonstrate that "their individual credit information would be requested by third-party businesses and provided by TransUnion during the relevant time period . . . [or] that there was a sufficient likelihood that TransUnion would otherwise intentionally or accidentally release their information to third parties." *TransUnion*, 141 S. Ct. at 2212. Here, counsel repeatedly invokes the specter of potential future release of information by the mailing vendor. *See, e.g.*, Complaint ¶ 25, *Stergakos v. I.C. System, Inc.*, No. 21-CV-2312, ECF No. 1 ("[T]he debtor may well be harmed by the spread of this information."); Letter at 2, *Stergakos*, No. 21-CV-2312, ECF No. 11 ("[A] letter vendor and its employees are often not subject to regulation by any statute or law imposing constraints on how long they can keep the information, what they can do with it, who they can disclose it to, or what security precautions they must maintain."); Response Letter at 2, *Ford v. Alpha Recovery Corp.*, No. 21-CV-2587, ECF No. 5 ("Plaintiff was distressed that Defendant would sue him for a debt he did not owe."). Such speculative claims of potential future harm cannot support plaintiffs' claim of Article III standing. *See Fifth Ave. Peace Parade Comm*. 480 F.2d at 332 (2d Cir. 1973) ("The shivering here was self-induced").

Third, the facts of these cases further distinguish them from cases in which plaintiffs can plausibly demonstrate injury-in-fact. In contrast to the spurious information at issue in *TransUnion*, to wit: erroneously branding class members as terrorists, the cases at issue involve debts ranging from $482.28 to as little as $25.00.[3] Such information differs exponentially from the OFAC data at issue in *TransUnion.* It is one thing to falsely brand someone a drug trafficker; reporting that they failed to satisfy a modest obligation is quite another. Thus, attempts to analogize the harms alleged to a traditional common law tort simply fail. For example, using the defamation analysis applied in *TransUnion*, it seems untenable that the possible non-payment of a relatively small invoice could constitute "a defamatory statement that would subject [plaintiffs] to hatred, contempt, or ridicule," particularly when such information is shared only with a mailing vendor. 141 S.Ct. at 2208. Similarly, it would be difficult to suggest, using the "invasion of privacy" analysis adopted in *Hunstein*, that communication of purported non-payment of a relatively *de minimis* debt to a mailing vendor constitutes a "matter publicized . . . of a kind that . . . would be highly offensive to a reasonable person." 994 F.3d at 1347; *compare Hunstein*, 994 F.3d at 1347 (defining the identifiable family of common-law, invasion of privacy torts used as an analogous measure of damages) *with* Response Letter, *Colas v. Sentry Credit, Inc., et al*, No. 21-CV-3383, ECF No. 6 (invoking invasion of right to privacy as sole ground for standing). Finally, plaintiffs cannot invoke the common law tort of intentional infliction of emotional distress because simply mailing a collection letter, even if erroneous, is a far cry from "extreme and outrageous conduct." *See Conboy v. AT & T Corp.*, 241 F.3d 242, 258-59 (2d Cir. 2001) (numerous telephone calls from debt collectors is not extreme and outrageous conduct that "go[es] beyond all possible

---

[3] According to the allegations in the complaints and the annexed documentation, most if not all of these debts were incurred by plaintiffs or, at a minimum, constitute debts arguably owed by the plaintiffs.

11

bounds of decency").[4]

*Alleged Deceptive Practices*

In two actions, in addition to the mail vendor claim, plaintiffs allege that the debts in question were not, in fact, owed, and therefore constitute actionable deceptive practices by the defendants. However, in not one of these actions does plaintiff allege any actual injury from receiving the purportedly false notice. For example, in *Ford*, No. 21-CV-2587, counsel for plaintiff filed a letter contending the following:

> Specifically, related to Defendant's attempts to collect money from Plaintiff that he did not owe, Plaintiff suffered emotional distress, confusion as to his rights and why Defendant was seeking to collect money from him that he did not owe, frustration, worry, and lost time. . . . Plaintiff was distressed that he was being subjected to collection attempts on a debt he did not owe.

Response Letter, ECF No. 5 at 2. Yet the complaint in that action is devoid of any such allegation. *Compare id. with* Complaint, ECF No. 1 ¶¶ 53-98. This, standing alone, would warrant a dismissal under Rule 12(b)(6). Even assuming, *arguendo*, that plaintiff could establish that the allegedly erroneous collection letters arose to the level of fraud, plaintiff is "barred from seeking damages for emotional distress on the basis of defendants' purported fraud." *Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95-CV-8450, 1998 WL 422482, at *8 (S.D.N.Y. July 22, 1998) (collecting cases).

In each of these complaints, though, the notion that plaintiff does not owe the debt appears predicated upon the notion that the plaintiff did not have any relationship with the debt collector. However, the collection notices appended to the complaints each clearly identify an "original

---

[4] On July 21, after the filing of this Court's show cause order regarding standing and the response thereto, counsel in *Colas*, No. 21-CV-3383 filed an amended complaint setting forth allegations regarding plaintiff's standing. Amended Complaint, ECF No. 10. Colas alleges standing based upon the mail vendor theory, specifically noting that the alleged violation of Section 1692c(b) "has a close relationship to an invasion of privacy" and "a public disclosure of private facts." *Id.* ¶¶ 8, 15. For the reasons set forth in this opinion, it does not appear that advising a mailing vendor about a $428 dispute could rationally constitute a "matter publicized. . . of a kind that . . . would be highly offensive to a reasonable person." *Hunstein,* 994 F.3d at 1347.

creditor," such that these allegations do not seem facially plausible. *Compare, e.g.*, Complaint ¶ 36, *Babst v. Phoenix Financial Services LLC et al*, No. 21-CV-3462, ECF No. 1 ("PCP is a stranger to plaintiff"), *with* ECF 1-1 at 2 (identifying "Port Emerg Med Svcs PC" as the "original creditor"). Thus, rather than a situation in which a plaintiff is being billed for an amount simply not owed, counsel seems to be invoking the notion that an original creditor is not properly identified, suggesting that the notice fails under the least sophisticated consumer test. *See Eun Joo Lee v. Forster & Garbus LLP*, 926 F. Supp. 2d 482, 487 (E.D.N.Y. 2013) ("Plaintiff has stated a plausible claim that the Collection Letter was misleading to the least sophisticated customer and failed to identify the creditor to which Plaintiff owed the debt."). To the extent the complaints allege such violations, plaintiffs again fail to show a concrete injury in fact from such a violation.

Finally, to the extent counsel attempts to characterize the notices as constituting informational violations of the statute, without alleging any harm, such efforts do not confer standing. *See TransUnion*, 141 S. Ct. at 2214 ("An 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'" (citation omitted)).

*Conclusion*

None of the plaintiffs have sufficiently alleged a concrete and particularized injury-in-fact sufficient to satisfy Article III standing. As such, the Court lacks jurisdiction over these claims, and the cases are dismissed.

For avoidance of doubt, the complaints are dismissed without prejudice subject to repleading within fourteen days. This period will allow, if appropriate, plaintiffs to amend their pleading to allege facts, if any exist, demonstrating actual damages or, in the alternative, other forms of relief that plaintiffs may be able to pursue. In addition, this dismissal is without prejudice

13

to refiling in state court if appropriate. *See TransUnion*, 141 S. Ct. at 2224 (Thomas, J., dissenting) (suggesting that state courts may have jurisdiction over certain claims even in the absence of Article III standing). After fourteen days, the dismissal will be deemed with prejudice.

**SO ORDERED.**

Dated: Central Islip, New York
      July 23, 2021

                                              /s/ Gary R. Brown
                                              GARY R. BROWN
                                              United States District Judge

## Ex. A - List of Cases Subject to this Order

| Case No. | Name | Amount of Debt | Class Action Sought |
|---|---|---|---|
| 21-2312 | Stergakos v. I.C. System | $387.28 | Yes |
| 21-2587 | Ford v. Alpha Recovery | $440.28 | Yes |
| 21-3002 | Nasca v. International Recovery | $25.00 | Yes |
| 21-3383 | Colas v. Sentry Credit | $482.28 | Yes |
| 21-3434 | Kivo v. State Collection Service | $330.03 | Yes |
| 21-3462 | Babst v. Phoenix Financial Services | $367.81 | Yes |